# United States District Court

EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| V. | § | CASE NO. 4:09-CR-238 |
| | § | Judge Crone |
| RICHARD EARL DAVIDSON | § | |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant's Motion to Suppress Statements (Dkt. #28). Having considered the relevant pleadings and argument given at the February 16, 2010 hearing, the Court is of the opinion that Defendant's motion should be denied.

### BACKGROUND

Defendant is charged in a multi-count indictment. Count One charges Defendant with Interference With Commerce by Threats or Violence in violation of 18 U.S.C. § 1951. Count Two charges Defendant with Using, Carrying, and Possessing a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A). Count Three charges Defendant with Possession of a Firearm by a Felon in violation of 18 U.S.C. § 922(g)(1).

Defendant seeks to suppress statements made to law enforcement on the grounds the statements were involuntary or the result of pressure or coercion by law enforcement officers. Defendant further argues that these statements were obtained as a result of improper promises or inducements. The Government argues that Defendant made a voluntary, knowing, and intelligent waiver of his right against self-incrimination.

Defendant was arrested on July 7, 2009, at approximately 9:00 A.M. by Paris Police Department officers responding to a complaint of suspicious activity outside a bank. Defendant and

another man were sitting in a vehicle.  Both men were wearing red t-shirts and blue windbreaker pants.  Officers approached the vehicle and asked if any weapons were in the car and Defendant stated that there were weapons in the car.  Officers found a shotgun and handgun.  Upon inquiry, Defendant told officers that he was a convicted felon.  Defendant was arrested and taken into custody for possession of a firearm by a felon and transported to the Paris Police Department jail.  Later that afternoon, Sergeant James Mazy ("Mazy") of the Paris Police Department and Special Agent Mike Krenek ("Krenek") of the Federal Bureau of Investigation interviewed Defendant in an interview room in the jail.  During the interview, Defendant stated that he and an accomplice planned to rob an armored car and that is why they were parked outside the bank with weapons that day.

At the February 16, 2010 hearing, the Government offered the testimony of Mazy and Krenek.  The Defendant chose to testify on his own behalf.  A video recording of the interview and a transcript of the interview were admitted into the record.

***Sergeant Mazy***

Mazy has over twenty years of law enforcement experience, six years as a sergeant, and has conducted around twenty interviews.  Mazy believes that the transcription of the interview and the video of the interview are true and accurate depictions of the interview of Defendant in this case.

Mazy did not know Defendant prior to the interview.  He was not part of Defendant's arrest, which occurred around 9:00 A.M.  The interview of Defendant took place in an interview room in the Paris Police Department jail and started around 4:35 P.M.  The Paris Police Department called the FBI that morning because "there was a feeling that something more than a felon in possession of a firearm was going on."

Mazy and Krenek were the only law enforcement officers present in the interview room.  The

room had no windows and the door was closed. Defendant was not handcuffed. Mazy introduced himself to Defendant and then explained to Defendant his rights by reading from a document that outlines the *Miranda* warnings. Defendant did not appear intoxicated and was coherent and able to understand his rights. Defendant told officers that he had a genius I.Q. and attended college. Defendant acknowledged that he understood his rights and signed the *Miranda* document. Defendant waived his right to remain silent by his own free will and understood the consequences of doing so.

Defendant asked to see his girlfriend. Mazy informed Defendant that at the conclusion of the interview he would attempt to contact Defendant's girlfriend. He told Defendant that he would ask Defendant's girlfriend to speak to Defendant over the telephone or come to the jail in person, but that he could not force her to speak to Defendant or visit him. Mazy told Defendant that this was not some type of bribe or deal to get him to talk to officers. Defendant said that he understood. Mazy would have let Defendant speak to his girlfriend if he had not spoken to officers about the planned robbery because he had given Defendant his word. Defendant never asked to speak to an attorney, but generally wanted to know if he would be able to hire a lawyer. The officers told him that he would be able to hire a lawyer.

The interview lasted approximately 2.5 to 3 hours. Early in the interview, Defendant made suggestive remarks that made the officers suspicious that Defendant and his accomplice were planning to commit a crime. Approximately 2 hours into the interview, Defendant made statements about planning to rob an armored car.

Defendant told the officers that his father was killed by law enforcement. The officers informed him that they were not concerned about his father and that they would treat him fairly.

3

Several times during the interview, Defendant became upset and cried. The officers gave the Defendant water and allowed him to compose himself. Mazy believes Defendant cried on approximately six occasions. At all times Defendant appeared coherent and understood what was going on. At no time did Mazy or Krenek make Defendant any promises in exchange for making statements. After the interview concluded, Mazy called Defendant's girlfriend and Defendant spoke with her on the phone.

### *Special Agent Krenek*

Krenek has been a special agent with the FBI for 25 years and has over 30 years of law enforcement experience. He specializes in interviews and interrogation and has extensive training in this area. He has participated in around 200 interviews. The average length of an interview is two to three hours. Krenek believes that the transcription of the interview and the video of the interview are true and accurate depictions of the interview of Defendant in this case.

Krenek met Defendant for the first time when he interviewed him. Defendant is experienced with the criminal justice system due to a prior felony conviction. Defendant did not appear to have any mental or physical disabilities or appear to be under the influence of drugs or alcohol. Defendant told the officers that his father was killed by law enforcement and that he feared it would be held against him. The officers told Defendant that they were there to talk about him and that he would be treated fairly. Defendant never requested to speak to an attorney and agreed to continue the interview without an attorney present. Defendant knowingly and voluntarily waived his rights before making statements to the officers. Mazy explained Defendant's rights to him and Defendant signed paperwork stating that he understood his rights.

Defendant asked the officers what was going to happen to him. Krenek told Defendant that

he was unable to tell him what would happen, but that if he chose to cooperate that he would inform the prosecutor of the full extent of Defendant's cooperation.

Defendant became upset and cried on several occasions. This occurred when Defendant was talking about his girlfriend and his children. Defendant stated that his family was very important to him. Krenek was unsure if Defendant was allowed under Paris Police Department policies to speak to his girlfriend. Mazy informed Defendant that he would be allowed to contact his girlfriend. Defendant's demeanor did not noticeably change after he was told he could speak to his girlfriend.

Officers did not make any promises to Defendant in exchange for statements. Krenek told Defendant that being honest about what happened would make him feel better and was the right thing to do.

When Defendant became upset, the officers gave him time to compose himself and gave him water to drink. Defendant became upset several times. After 15 or 20 seconds, Defendant reinitiated the conversation with the officers.

The interview lasted around 2.5 hours, and about 2 hours into the interview, Defendant admitted that he was planning to rob an armored car. After Defendant admitted to the planned crime, the interview continued for about 15 minutes.

Defendant was fully capable of speaking to officers on his own and there was no reason to have a family member or any other person present. Defendant told officers that he had some college education and Defendant did not have any physical or mental impediments to keep him from freely and voluntarily speaking with the officers.

### *Richard Earl Davidson*

Defendant was advised by the Court of his right not to testify, but decided to testify on his

own behalf. At the time of the interview, Defendant was under arrest and in custody. Defendant asked several times to see his family. Defendant understood his *Miranda* rights at the time he signed the document presented by Mazy. He was very emotional during the interview and felt like the whole world was crashing down on him. At that point, jail did not matter to him. The only thing that mattered was thinking about holding his son and his daughter. When the officers told him that he could speak to his girlfriend, he told the officers that he would tell them what they wanted to hear if they let him see his children. Defendant is not sure if he used those exact words, but stated "something to the effect of...I'll tell you what you want to hear if you let me see my kids."

## ANALYSIS

In *Miranda v. Arizona*, the Supreme Court concluded that the possibility of coercion inherent in custodial interrogations raises the risk that a suspect's right against self-incrimination might be violated. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). To protect against this danger, *Miranda* creates a presumption that a confession given during a custodial interrogation is coerced, in the absence of specific warnings. *United States v. Patone*, 542 U.S. 630, 639 (2004). A suspect may waive his right to remain silent, but the waiver must be made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444.

The inquiry whether a valid waiver of *Miranda* warnings has occurred has two elements. *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005)(citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id*. "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. A statement is voluntary if,

6

under the totality of the circumstances, the statement is the product of the accused's free and rational choice. *United States v. Scurlock*, 52 F.3d 531, 536 (5th Cir. 1995). The Government has the burden of showing by a preponderance of the evidence that the statements were voluntarily made. *Id*.

Defendant argues that Defendant's inculpatory statements were not given freely and voluntarily. Defendant states that while there was no overt coercion by law enforcement, the officers took advantage of Defendant's mental state because they knew that Defendant was focused on wanting to see his family. Defendant asserts that telling Defendant he could see his family after the interview was an improper promise or inducement. The Government argues that Defendant made a free and voluntary waiver of his rights and there is no evidence of coercion or duress. The Government points out that Defendant even expressed that he liked the officers and at no time did Defendant's emotional state rise to a level requiring the officers to discontinue the interview.

After considering the pleadings and the testimony presented at the hearing, the Court recommends that Defendant's Motion to Suppress be denied.[1] The Court finds that Defendant made a knowing and voluntary waiver of his *Miranda* rights and was not coerced or threatened by law enforcement officers to do so. The Defendant testified that he was read and understood his rights and Defendant signed a document stating that he understood his rights. The Defendant told officers that he attended college and that he had a high I.Q. There is no evidence that Defendant requested or was denied access to an attorney. Defendant is a convicted felon and is experienced with the criminal justice system. Defendant has presented no evidence of physical or mental disabilities.

---

[1] The testimony given by the Government witnesses outweighs the contradictory testimony given by Defendant. As the burden is a preponderance of the evidence, the question is whether or not it is probably true that the Defendant was extended his *Miranda* warnings and knowledgeably and voluntarily waived them. In viewing the testimony, the Court finds that the Government witnesses are more credible than the Defendant.

Defendant testified that he reads and writes the English language. Therefore, there is no reason to believe that Defendant did not understand what was happening or was not capable of making the decision to waive his rights on his own.

Defendant's argument that officers took advantage of his being upset and wanting to see his family is insufficient to show that he did not voluntarily act on his own free will. Defendant expressed at the end of the interview that he liked the officers and that they were good at their jobs. The evidence represents that officers gave Defendant time to compose himself after becoming upset and that Defendant reinitiated the conversation himself. There is no indication in the record that Defendant requested the interview to end. Further, the record shows that Sergeant Mazy told Defendant that allowing Defendant to speak to his girlfriend was not a promise or bribe being made in return for Defendant making statements. Defendant acknowledged that he understood.[2] Therefore, there is no reason to believe that Defendant's mental state prevented him from making a knowing, intelligent, and voluntary waiver of his rights.

Defendant's reliance upon *United States v. Kim*, 292 F.3d 969 (9th Cir. 2002) is misplaced. In *Kim*, there was a question as to whether a store owner was in custody for *Miranda* purposes. The Ninth Circuit stated "the police in this case...took over complete control of Kim's store, creating a 'police-dominated atmosphere,' in which family members who could have provided both moral

---

[2] Any indication by law enforcement that Defendant could somehow help his case by cooperating is simply not sufficient to show that Defendant did not act under his own free and informed will. *See United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996)(concluding that an agreement that the United States Attorney would be apprised of a defendant's cooperation, coupled with an express admonition that a defendant would still go to prison, does not constitute a promise of leniency); *see also United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978)(concluding that a statement that the accused's cooperation will be made known to the court is an insufficient inducement to render subsequent confession involuntary); *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1348 (5th Cir. 1994)(advising accused that there are advantages to cooperating does not render a confession involuntary).

support and, given her limited English, a more complete understanding of the overall situation." *Kim*, 292 F.3d at 977 (citations omitted). In the present case, there is no question that Defendant was in custody and under arrest. There is no evidence that Defendant had difficulty with the English language that required an interpreter or assistance from a family member. There is no evidence in the record that even suggests that Defendant did not "understand[ ] the overall situation." *Id*.

The Government has satisfied its burden of showing that Defendant knowingly and voluntarily waived his rights prior to making the statements he seeks to suppress. Therefore, there is no basis for suppression.

### RECOMMENDATION

The Court recommends that Defendant's Motion to Suppress (Dkt. #28) be DENIED.

Upon agreement of the parties, within five (5) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c).

Failure to file written objections to the proposed findings and recommendations contained in this report within five days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 19th day of February, 2010.**

AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE